23-72135, Jane Doe v. DC, Ms. Murray for the accounts, Mr. Killick for the appellate. Good morning. Good morning, your honors. May it please the court. This case is about, this is a Title IX case that has been brought by the appellant Jane Doe in this situation. This case, as far, there's four counts at issue. I'll just take them one at a time, starting with count one, which is her Title IX count for private action. This count was dismissed on summary judgment by the district court and we feel that that dismissal was erroneous. It really turns on the issue here of whether the district's response to Jane's report of a sexual assault was deliberately indifferent. And in order to prove deliberate indifference, we have to show that there were facts that could have been construed by a jury as clearly unreasonable in light of the known circumstances. This test considers the disciplinary authority both available to the school and the potential liability arising from certain forms of disciplinary action. It has also been described as examples of where deliberate indifference has been found is described as an official decision not to remedy the violation or the sexual harassment, or where there's a combined systemic effect of sexual harassment and the school's response effectively denies the victim's access to a scholastic program, activity, or school. One of the components of deliberate indifference is to show that the school's indifference to it allowed the victim to be either additionally harassed or made the victim vulnerable to it. This is not necessarily in the case of student and student sexual harassment, which is what we have here, showing that the victim suffered additional harassment from the student, but rather could be the school's deliberate indifference or the school's own actions being interpreted as sexual discrimination or harassment against the student. And that is what we believe has occurred here. Does your argument center on the claims of delay? Because the school certainly did respond here quickly, within a day or so. She was offered transfers. This was at the end of one school year, and before the next school year, she was able to go not just to another school, but to a school of her specific choice, which Shadaline did not require. And there were measures put in place to offer therapy. I think there was like a summer program. And so it seems like it may not have been executed well, but at the end of the day, the actions were taken that would, at a minimum, take this out of deliberate indifference category, unless your point is, is it just time delay? I'm unclear, given that this isn't an unresponsive district. Sure. I appreciate that question. So it's a two-part. I believe this can be dissected into two parts. I think the first part is what occurs over the summer. Of course, this assault occurs on the last day of school. I think that's undisputed. Once the assault is reported, there is a delay, not necessarily in having the meeting, which Your Honor acknowledges happens the day after, but there is a delay in the school taking any further action associated with this. Was she not offered a transfer within 48 hours? It was discussed. She still had to go through, and it was actually her mother who went through and was the person who actually made the request to the transfer office. None of the administrators did that, Your Honor. Was there an offer from Dr. Pinder early on? Dr. Pinder discussed that with her. Okay. But discussed it as in, this is an option for you? Or discussed it? Well, the way the transfer office works, and this is something we learned through discovery in this case, obviously, is that if there is a sexual assault, or even something that's not a sexual assault, a regular assault, a student or an administrator can apply for a victim safety transfer for the student. That didn't occur on the part of any of the administrators, despite statements to my client's mother that they could go ahead and do that. She had to go and be the one to actually make the transfer request, and when it was made, it was interpreted as a discretionary transfer by the transfer office. But does that matter? At the end of the day, she got what she wanted? I believe it. How can that be delivered in difference? It sounds like this is sort of the bureaucratic processes and paperwork, and there wasn't urgency because it was over the summer. So, it's a little hard to put that in the, you know, not exemplary category, certainly not best practices category, but it's hard to see how that's delivered in difference, given how strict that standard is. Well, so the transfer that they were seeking was a specific safety transfer to two specific schools, either school without walls or Wilson High School. The victim safety transfer would have allowed her to do that because it was put and funneled through this discretionary transfer as she was given three schools that were just posited by the transfer office. In trying to make the determination, the transfer office representative, a man named Milo Howard, emailed the various administrators who were responsible for investigating this assault and asked them, essentially, was this, the question's for ACES, was this a valid sexual assault? And at the time that that question was posed, the administrators, at least two of them, had viewed the video footage, which is undisputed, shows her being dragged into the bathroom by the boy, had done the interview with Jane, so knew her version of events. And despite having that evidence indicated to the transfer office, only that the police were not prosecuting. They never discussed the video. They never discussed. Wasn't the only question posed to them by Mr. Howard, what did MPD do? No, it was, was this a valid sexual assault? But then what did MPD do or was there a prosecution? I thought he had follow-up questions. He did have follow-up questions about MPD, but the initial question was, was this a valid sexual assault? And of course, schools have their own ability. I just have a paperwork question here. For victim transfers, do they need the police to say the crime occurred? Oh, Mr. Howard actually says that you could have that as one factor, but you could also have had another item that was present here that never made it to the transfer office, which would be the letter of resolution from what was at the time the district civil rights office. Which found that she had been, I think they characterize it as sexual harassment, but she had been sexually harassed and set up those other measures, including the therapy and the summer program that your honor discussed. That letter never made it to anybody, the administrators or the transfer office to allow this to take place. So my, my point is all of this taken together in context creates this delay over the summer. She ends up being transferred immediately before school starts. She has additional anxiety associated with that. That's very clear in the record. And it's not until really until David Kinder learned. But these same actions that happened, but it happened within June or resolved by the end of June, but it still be deliberate indifference. So, you know, but instead of knowing by, I don't think that you're going to the date. I don't think for that set of facts that it that it would be, I think the delay is, I think the delay is significant. And then the other portion of this argument, your honor, is that the, and I see that I'm running out of time and I haven't even gotten to the other three counts here. But the other portion of this argument, your honor, is that once she is transferred to Wilson, those administrators are never provided with the letter of resolution. They are never provided any information about the fact that she was assaulted. She starts to miss school, in part, because she's having these physical. You help me understand the failure to provide that information because I can imagine. District being caught in between, because I don't know if it's is a policy to share this information on school. It's I can imagine because this is in addition to being incredibly traumatic. It's also both as a sort of medical information, which is generally treated quite privately. And so I can imagine plenty of people saying, I don't want. You to be telling other people about this. I want a fresh start at the new school and getting mad. They had told the school. And in fact, there's some claims here of distress caused by people at that school. Haven't found out why she was transferred there. So, how is the failure to tell Wilson folks why she was being transferred there being allowed to transfer their. Liberate indifference, my argument would be your honor that it could. And I believe this was testified to by David Pender. Although I don't have the citation, your honor, but that it would go to at least the top administrators of the school, which would have been at the time. Principal Martin, she does not find out about this until that established policy or discretionary decision. I believe that that is established policy to make sure that they know that they have a student who has special needs associated with the finding of sexual assault at another school. I believe that that's what David would say private medical information. I'm sorry, even if it's private medical information. Well, it's not necessarily medical information that she needs to attend therapy because of that, or that the school system was giving her in effect permission to do so, which is where we have the issue here. They don't have that information. She's being marked as absent and unexcused absences. There's very negative repercussions that come with that. Given the number of absences she's eventually kicked off of her cheerleading team. She's placed into the truancy system in DC Superior Court where she's effectively monitor and it took not one, but two attempts by her family herself and her mother to have these absences overturned. And eventually the district two years later, there's only 10 of the absences that were overturned. Yeah, it did overturn 10 of them. They disputed. Yes, they disputed that much more were related to that. And our argument is that Jane's condition at that point had snowballed. You know, she's missing other other days for depression related symptoms. She testified about all. So, I don't think I think there's an argument here on the part of the district that these absences are due to Jane's own negligence or other things that are going on in her life. There's an attempt by the district to sort of wash their their hands of their part in that leading up to this, including, of course, James's comments about her during the meeting. James's attempts to undermine the investigation of the assault afterwards. We believe that those things are clear in the record. Suppose there was deliberate indifference. Can you help me with your theory of causation? Because you still have to show that the district caused discrimination based on sex. And usually in these harassment cases, the harassment is something akin to a hostile work environment. It's ongoing. And if the district knows about it and deliberately fails to stop it, it is fair to say that the district caused the district caused harassment that continues. This is very different. This is a this is a horrible incident, but it's a one off. She is assaulted. It's done. What's the what's the assault or harassment or discrimination that the district caused in how they deliberately or otherwise responded? So I think it's the it's the response to the assault. How does that cause? Well, I think it's that in and of itself is this. It is discrimination by the district in response to reporting the assault. So there's the response of the assault. And then there's also, of course, the actions that are taken against her at Wilson. There's two cases that we rely on, William versus the Board of Regents of the University of Georgia. That was also a one off incident where a student is raped in a dormitory by basketball players at the University of Georgia. In that case, the student withdrew from the school the next day and the 11th Circuit found that the school's response in failing to discipline the basketball players, failing to do any kind of investigation of it for, I think, a period of about eight months constituted deliberate indifference and was further discrimination, given the severity of what had already occurred. Your point is that went off and that there was the assault. And then there was and then the response by people who were supposed to want to trust that would help and keep her safe. Correct. And to affect certain certain remedies. Right. That just compounded the harm. You had expert testimony that that that obviously emotional trauma from the assault itself. Right. And also for a child and not to learn the people who are supposed to protect her are turned against her. Absolutely. The second harassment, that's that's the additional harassment that occurs after the report. It's not another student's harassment. What's what's the 11th Circuit case? Sorry. William versus Board of State Regents. Got it. Thanks. Thank you. Any further questions on six minutes over. That's OK. So there's not a lot of case law that interprets retaliation in the title nine context. I agree with that, Your Honor. And the case law does say that for the municipality to be liable, it's only liable for its own conduct, not for the conduct of individual actors within its purview. And you agree that that's the same rule with respect to retaliation. So we don't need to just look at, for example, Principal James, but to look at the overall response. I, I agree. I agree with that, Your Honor. I do think James is part of that. And there is a case which indicates that the school, the highest administrator at the school, which forces her at the time the assault occurs and is reported, is an agent for for the district. So I do think that her conduct, as it relates to the comments that she made in the June 14th meeting, and then really her her actual actions taken afterwards, I know much has been made of. She made she cut despite her comments. She called police. She I mean, I think that you definitely have a stronger case if we just look at Principal James. But I guess my question is, the law requires to look at the overall response, including Pinder and other people who I think responded appropriately. I, I think that's true. And I do think there are people who responded appropriately. But I think as far as the retaliation goes, James's comments can't just be looked at as solely comments. There were actions that were taken that David Pinder testified about misleading comments to him about what the video showed in particular. Which, again, caused harm to Jane, caused delay in the transfer. And then when she is transferred, of course, this additional finding of the sexual assault never made it to Wilson. And I do think the fact that Wilson is marking her as absent for therapy appointments that were sanctioned, as well as other things that were going on in her life, like depression, putting her in the truancy system. All of those things can add up to retaliation, Your Honor. I'm also interested in this intentional infliction of emotional distress claim. And it just seems like the elements of that cause of action can be met based on what Principal James did, but perhaps not. It's not in a straightforward way, because if it's just a question of whether this should get to a jury, I think that what she did could be considered extreme and outrageous. There's a sexual assault allegation, and without any investigation, she called it BS. And then she said that she was going to call the police in order to embarrass the victim. And so I think that that could be viewed as extreme and outrageous. And it did cause, I mean, you could arguably say it caused emotional distress to Jane Doe, because Jane Doe overhears this. And there is evidence in the record from a psychiatrist that this amplified the trauma for Jane Doe. And I guess the thing that is a little bit unusual in this factual circumstance is that Principal James didn't intend for Jane to hear that comment. But I have not been able to find any case law that requires that kind of specificity. If there is extreme misconduct and intent to harm, she says she wants to embarrass the sexual assault victim before the police. And it did cause that kind of, I guess, damage. It seems to meet the elements, and I haven't been able to find a case law that seems to support the district court's analysis, which says that because Principal James didn't intend for her to hear it, it doesn't count. I'm struggling a little bit with this factual scenario. I agree with Your Honor that there's no case law requiring that specificity. There's not a ton of case law in the district on this point. Or anywhere that I could find. Yeah, I don't have anything that specific. Does it require only intent, or I thought recklessness was also sufficient? Recklessness is part of it. It's a set of intents. Correct. Reckless to make comments like this when the child is outside the door. Particularly considering the context, right? This occurred in a meeting. This is not a private meeting that she was having with her colleagues about it after the fact. This is during the reporting of the sexual assault, just right after the child had become distraught and walked out of the room and was standing just immediately outside the door. I do think those factual circumstances. I thought there was evidence that she, I don't know if she could discern words, but could hear the voices talking. Correct. And is it that the words themselves are extremely outrageous? Or is it that you have the head of the school with the people gathered there, and he wasn't talking to himself. He talked to the people who he called to investigate this matter. And then without any knowledge whatsoever of what's going on, immediately tells them that this whole thing is BS. And he's out to embarrass her. That's his goal. And by the way, look at that dress she's wearing. Two of the very people are supposed to investigate this.  And then there's a further act of lying to Dr. Pindar about the content of the video.  I mean, to be fair, they were hand in hand only because he was hauling her into the bathroom by holding on, maybe with my hand to wrist, probably more accurately, hauling her in there. But that was a complete, also to interrupt, I'm trying to get to, is it just the comments themselves, or is it that he's sort of trying to skew the investigation against her, the school's investigation, from the outset? And then continues to take additional action. I think it's all of the conduct. And I think the case that's dispositive on that is Drasia. Granted, the district's argument is that those comments were made directly to the victim's face in that case. It was a detective who was supposed to be investigating a report of rape. But what that case says is you have to take into account the circumstances, the position of authority, the entire tone and flavor of the conversation. And the tone of the meeting was certainly aggressive towards Jane, which is why, as well as the power dynamic. Well, maybe it's not face-to-face, but you're talking about a power dynamic between a principal and a child. Correct. It's very similar to… In that case, there's another case that says… It's Drasia that talks about the power dynamic, but that's in the context. I think there's another one that talks about children having special… You know, that it's just different. Yeah. Applying for… I believe… …in extreme conduct is different. That's a case that we addressed in our section on the negligence inflection of emotional distress. It certainly would carry over to the intentional inflection, Your Honor. Do my colleagues have further questions? Thank you very much. Thank you. We'll hold a couple minutes for questions. Good morning. May it please the Court. Graham Phillips on behalf of the Attalees. Unless the Court would like me to start elsewhere, I'll begin with the Title IX discrimination claim. And we think that this claim fails for either of two broad reasons. First, because the district was not deliberately indifferent because its response to Jane's assault was not clearly unreasonable. And second, independently, there's no evidence that the district's alleged indifference caused the type of further harm that's required under Davis to sustain a private action for damages. Can I ask you to focus on the retaliation component of Title IX in particular? First of all, is James, as a principal, a senior enough official under Gebser in that she had the authority to control responses to retaliation within the school such that she would be responsible? I forget the word. Accountable official for that purpose? Right. So I think the answer is different depending on who it is that you're talking about performing a retaliatory action. We talk about James herself retaliating as in, again, really upset about this complaint, sexual assault, so spews venomous words to the very people who are supposed to do an objective investigation but who report to her. And then there's at least evidence in the record, a jury would, I'm not saying right or wrong, but there's evidence in the record about talking to the police officers and then the police officers were hostile when they interviewed Jane Doe. And then there's the lie to Dr. Pinder about the content of the video. And if those actions are viewed as retaliation for the complaint being filed. And I guess you got the transfer and things like that, but I don't see what the district did to undo the impact of those retaliatory acts on the investigatory process, including the MPD process. And so if James is the person who is the one who would be responsible for redressing or counteracting the retaliation, it didn't happen here. So there's a lot in your question, Your Honor. I'm sorry, there's a lot of different questions. But I think I'll start with what I think is where you started and I think is maybe the most important piece about this. For purposes of the school district having actual knowledge, Principal James's knowledge of her own alleged misconduct does not count. That comes directly from Gebser. Gebser says that the knowledge of the wrongdoer, him or herself, is not pertinent and that that conclusion is also supported by reciting. It was in Jackson versus Birmingham, the one where the coach reported discrimination against the girls' sports team. And it was the board that retaliated against the coach. And it was the board that was the responsible official under Title IX. So it can be the same. I think that's because the board itself is essentially the official policymaker. It is itself the entity. Principal James is not the funding recipient. So she is separate. I thought they said in Gebser people who have the authority to address. I'm not talking here about the whole transfer and that thing. It seems like there's different parts of the district that deal with that. But when it comes to the retaliation about this school investigation and the MPD, who else? I understand that. But Gebser says that the wrongdoer's own knowledge is not relevant. If you think about the facts of Gebser, and I think it's helpful on this point to really. How did the board in Jackson have notice? Because they only had notice because they were the wrongdoer. Well, I think it was the wrongdoer. Right. I think there is a distinction when the knowledge is directly to the funding recipient itself, the board. And here that would be knowledge by I think it would probably be the chancellor of DCPS. It has to be the chancellor only? No, but your honor. Could it be Pinder? Oh, if Pinder had knowledge of James's wrongdoing, that counts. Yes. Yes. And when he did have knowledge of her alleged wrongdoing in this case, he took reasonable corrective actions. That's part of why her conduct cannot constitute retaliation. But what corrective actions were taken to deal with the retaliation? I get that they were to deal with how the sexual harassment claim was processed and dealt with, the transfer, those things. But the retaliatory steps to sort of ruin the investigation before it started and, you know, to ruin the – and to be clear, all I'm doing here because we're at summary judgment is considering the facts in light of what's favorable to the plaintiff. I'm not, in fact, saying that any particular view of this is right or wrong. But if we view it from that lens, he's also sort of the police whisperer and then skews their investigation before it even starts. So, your honor, I mean, one thing, this notion that she skewed, that Principal James skewed the police investigation, I think is totally dropped out of this case on appeal. That is not something that on appeal is listed as an alleged retaliatory action. And I think the reason why that's the case is as the district court explained in some detail, there is no admissible evidence that Principal James sort of said something poisonous to the police about that. So that's not – Was there inadmissible evidence to that effect? Well, I mean, all there was was Jane Doe's and Julie Doe's understanding that she had said something to the police. But they didn't have any knowledge. Well, they were there. Did they not witness the talking? Did somebody witness? Well, they did not witness Principal James saying something to the police that was inappropriate. Did they witness talking – I'm sorry, just witness saying something inappropriate is what I meant. Did they witness James talking to the police? No. I don't think there's any evidence of that. I'm surprised nobody deposed the police officers. Nobody deposed the police officers. Principal James' deposition is that she never talked to the police officers. And there's no direct evidence that she did. She directed that they be called, and they showed up at the school. And then she said she was doing so to embarrass Jane Doe. And then the police were quite hostile to this. Apparently, there's evidence in the record that when the police spoke to Jane and Julie Doe, they were kind of hostile. Well – So that suggests that perhaps something did happen. But I think without deposing the police officers, I don't know. That's right. I think the only direct evidence you have is the recording itself. The police officers had to talk to somebody when they arrived. That's right. If you listen to the recording, and although we think the making of the recording was improper, we don't object to this court listening to it. They arrive, and they arrive in the room, and they talk with Jane herself. And I think they talk with the intervention coach. Or the one that James had just skewed the view beforehand. The intervention coach that was in the room when James was making these comments? He – Yes, that I'm bringing the police here to embarrass this person. This is all BS. And that person who reports to James? Yes. Then interacts with the police, and suddenly the police are hostile? That's not evidence? Your Honor, I don't think there's evidence that – Is there evidence that a reasonable jury could infer? A couple things, Your Honor. Again, I think this whole issue of poisoning the police investigation has dropped out on appeal. And I think this court should focus on the arguments that the parties made. So I think it's out of the case. We're looking at the district court's semi-judgment decision here. That's right, Your Honor. But I think this court's position on appeal is to address the arguments that James has chosen to make on appeal. But I don't think you will find any such theory in her brief. So if I could return to the – I mean, on the question of whether Principal James' knowledge of her own wrongdoing is itself knowledge to the funding recipient, I think that's foreclosed by Gebser. And, again, I would suggest looking at the back and forth between the majority and the dissent in Gebser about that point. Because the court's sort of definition of who is an appropriate person turns on their authority to correct the harassment. And as the dissent there said, well, that's obviously true in a teacher-student harassment case. Obviously, the teacher themselves has the corrective authority to stop sexually harassing the student. But the problem is that their knowledge of their own wrongdoing is not treated as knowledge. Is it clear from Gebser that had the principal in that case known about the teacher-student sexual harassment, the principal wouldn't have been sufficient either? Oh, no. And we don't dispute. I mean, it may depend on some vagaries of state law. But I think in the average case, if a principal knows about a teacher's sexual harassment, that is sufficient knowledge. But your principal is not the funding recipient. That's right. So the test isn't whether a funding recipient. That's correct. It's whether a person with sort of sufficient corrective authority knows. The highest person in the school is the one who's also doing their harassing. There's no claim. But anyone below that person there is. But you were saying it had to be knowledge by the recipient of funds. And the principal, the school, is indirect recipient of funds. But the funds are going, I assume, to the district or Department of Education or something. So I guess I would direct. I think the best way to think about this or a helpful resource to think about this, we cite these cases. There's an MS-XREL-Hall case from the Third Circuit and the Salazar case from the Fifth Circuit. They're about exactly this issue. They're the only corporate appeals decisions that I know of that are on this issue. And they both hold together that a wrongdoer's knowledge of their own wrongdoing, even if they are a principal, assistant principal, is not itself enough to trigger. Tim, those cases aren't binding on us. So why? You started by saying Gebster foreclosed because the principal and the school are not funding recipients. But that has fallen away because someone with sufficient authority to address the retaliation within the school is all we need. And if it turns out that the one unquestionably that holds that position, the principal, also is the perpetrator, they get off scot-free under Title IX, but everyone underneath them wouldn't. That seems an odd rule to adopt. So I think the way that – what Gebster cites for it is the restatement of agency. I think it's Section 280 where they say, for purposes of this knowledge inquiry, the wrongdoer's own knowledge is not pertinent. Am I correct that under this test you want us to adopt when the principal is the perpetrator? No Title IX liability just because the one with the most authority became the most abusive person in the building. If no one else was – If no one else could correct the principal – Oh, the superintendent could. No, no, within the school. I'm talking within the school. Right. Because you agree that it can be someone within the school which is only an indirect recipient of the funds. Correct? Yes. So we don't have to find that it's always someone outside the school, someone with – again, I don't know which entity gets the funds in D.C., the district, or it's Department of Education, but whatever it is. The short answer is yes, Your Honor. If the principal is themselves the wrongdoer and they're the only person with knowledge of the – If anybody else in the school under them is the wrongdoer and the principal knows, that's sufficient. Yes. I think, again, unless there's some kind of weird situation of state law about authority, then yes, that's the result. It's like an odd rule. I don't think it's any odder than the circumstance in Gebser itself where, again, it was a teacher sexually harassing a student. The teacher themselves obviously have the authority to stop doing that, but their knowledge of their own wrongdoing is not considered sufficient. No, but they're not – the teacher is not in a self-supervisory position in the formal way, in the way that a principal is in charge of running the school, running everybody in the school, and implementing legal policies within the school. This seems to be a materially different point. I mean, I think certainly in the District of Columbia it's subject to additional supervisors, including the superintendent, and here, again, when the superintendent – No, but a lot of this doesn't get outside the – schools can be their own communities. It just seems an odd rule to me. I guess I'm repeating myself, and I'll stop there. But that it is sufficient under Title IX for everybody in the school, if they engage in appropriate conduct, that they will be subject to Title IX unless the principal addresses the problem. But when the principal does it, they're just carved out of liability. Unless somebody happens to somehow get noticed way outside to some other building miles and miles away where somebody in the district superintendent's office or the Department of Education happens to hear. I mean, I do think that is the upshot of Gebser, and I think it's based on the principle in these decisions from the Third and Fifth Circuits talk about it, which is that in this private action for damages, which is a judicially created right of action, we're trying to, to the extent possible, kind of parallel the administrative scheme, which really is based on the notion that the funding recipient will be notified of discrimination and given the opportunity to fix it. And so in the instance where it is a principal who's doing the wrongdoing, that does require that someone higher up the chain be given that knowledge and the chance to fix it, which is, I think, a chance to respond reasonably to it, which I think did occur here once Superintendent Pinder became aware of the wrongdoing. So what's the alleged retaliation? What's the actual retaliatory act alleged by this? So I think there are two alleged instances of retaliation that are actually preserved on appeal and presented on appeal here. So the first is Principal James's recorded comments. And the second is her being marked as absent without excuse in Wilson during her junior year. So, you know, I think with respect to the recorded remarks, I mean, I think that the main thing that I've already talked about is that when the response, the person with corrective authority learned about those things to Superintendent Pinder, he acted not unreasonably to respond to them and launch this investigation of Principal James and she was reprimanded for this. So I think that, among other reasons, I think that defeats that. And also because, and you're right, I think this might go. Has anything been done to address the impact of James's comments on the other people in the room who are responsible for conducting this investigation? I don't talk to them and say that was wrong. Make sure you're going full throttle on this investigation. Not that the record was clear that there were other people in the room. Yes. Coordinates of James to whom these talk. These comments were directed. That's right. There were other there were other school officials there. There's no evidence that anything was done to redress the impact of retaliation with them. Well, I don't I mean, I don't make sure they didn't get sucked into this retaliatory process. Correct. I don't I don't think there's anything on that point. I also don't think there's any evidence that anyone else at the school did anything even arguably wrong responding to these allegations. And I just would take a second on this deliberate indifference point. I mean, run through the things that the school, the school district did here immediately called the police, immediately collected the security camera footage, which was important. Within days, Superintendent Pender agreed to let her to transfer schools. And over the course of the summer, sort of expanded the transfer options available to her, conducted a Title nine investigation that substantiated her allegations and proposed a bunch of remedial measures, including most importantly, separating the two students if they both return to Roosevelt. Offering if a school does, let's take this hypothetical school district school school says you can transfer to one of the schools. I know. I know. Sorry, I can't remember if it's Davis or Dexter. They don't get to prescribe every single aspect of the remedy. But if the offer is to transfer to schools that actively worse academically or safety wise or both. I'm not hypothetical. I don't know that. But if a school were to only offer the victim the option of going to a worse educate objectively or Jerry could find worse educational opportunity. That would not be an adequate response. I think quite possibly not. If that was sort of the only thing they offered is, you know, we're going to prevent further sexual harassment by letting you, the victim, go to a worse school. That would be depriving of the equal educational opportunity. I'm digging in a lot of assumptions here that I think I think arguably. Yeah, I think arguably. Yes, I think arguably. And then whether it's true or not, that was sort of the reaction that Jane Doe and her mother had to the schools that were offered until Wilson was offered. I think that's right. That was there. I would say that was their subjective reaction. And I don't think they're either. I'm not suggesting. Yeah, right. Be clear. It's a hypothetical. Yes. Yeah. No, I think. But in fact, and I take it there's no summary judgment evidence on this. But if you had a case where it was shown, just to be clear. It is not appropriate response to put the victim in a worse education. I think that's right. And I think in the record here, there there is a sort of grievance policy. And actually one thing it talks about in there is about how the response should not be to sort of force the victim to go to a different school or change their. Sort of what how they're experiencing school. To what extent do the deliberate indifference claim and the retaliation claim kind of rise and fall together? Because both seek to hold the district responsible. The district's only responsible for its own conduct. And if the district's response was all the things that you said. That's not retaliatory. I'm just wondering, is there any difference in the factual predicate under retaliation versus deliberate indifference? I mean, I do think they are analytically distinct and and you could imagine a version of this case where under different facts, there are some action that that does qualify as retaliation, but doesn't amount to just straightforward discrimination under title nine. I guess that's in part because, you know, in judging the reasonableness or not of actions under the discrimination test, you're asking whether they're reasonable in terms of preventing sexual harassment from occurring or continuing. But that is not what you're asking for retaliation. So it would be possible for there to be some action that's sufficiently adverse taken with the requisite intent, but doesn't go to whether it's likely for the sexual harassment to recur or. But in this case, is it your position that the district's response was not retaliatory because it was all of those things that also you're relying on to say they weren't deliberately indifference? I'm just trying to understand what is a different factual predicate. I think it mostly overlaps. I think the one piece of the retaliation where maybe we would think about them slightly differently is the one and only other allegation of retaliation on appeal that I think is preserved, which is the marking her as absent without excuse in her junior year at Wilson. You know, that cannot sustain the Title IX discrimination claim for various reasons, one of which is even if that was the wrong thing for the school to be doing, that did not make it more likely that she was going to be sexually harassed again. The reason it's not sufficient for retaliation, I mean, the main reason is that there is no evidence that these mistakes occurred with retaliatory intent. So that's one place where I think the analysis works out a little bit differently. I recognize I'm well over time. I would be happy to address some of the court's questions about IID if you're interested. So with respect to Principal James's comments themselves, I don't think they satisfy the outrageousness element. Let's assume that they do. Okay, let's assume that they do. I hope I can try to persuade you later that's not correct, but let's assume that they do. At least a jury could find it so. I mean, I don't have to decide if it does or doesn't, but could a jury find it so? Let's assume that a jury can. Let's assume that a jury can. Then I think the reason the claim fails is the lack of evidence of intent or recklessness to cause Jane, through these comments, to cause her severe and extreme distress. So it's undisputed that Principal James did not intend for Jane or Julie to hear these comments. She made them when they were out of the room. Do you think that it's an element of the offense that the perpetrator has to intend for the victim to know that they intend them harm? It has to be. I mean, if we're saying that the comments themselves are the outrageous conduct, it has to be that the defendant intended to cause extreme distress. Well, I think you can infer that or a jury could based on saying it's BS and I'm going to embarrass this person. There's an intent to harm Jane Doe. I think what the district court relied on was that there was no intent for Jane Doe to hear it. And it's not clear to me that that works. I think it does, Your Honor, because I think we have to separate. Did she intend for her conduct? Was her comments evidence that she intended for her subsequent conduct to cause Jane harm? I understand that theory because what she says is I'm going to embarrass her. But what she says she's going to embarrass her by doing is by calling the police. And that is not extreme outrageous conduct. That is appropriate conduct. But she says to the people who are in charge of the investigation, this is BS. And by the way, look at her dress. And yeah, I'm not going to embarrass her in vulgar terms, no less. And if that's to tank the investigatory process going forward, wouldn't it at a minimum, couldn't a jury find it reckless as to whether tanking this investigation going forward, poisoning the minds of the people who are going to be conducting it, is going to cause additional serious harm? We're talking about a child here who is supposed to be able to trust the adults to protect her. And suddenly they're all telling her, you're lying, you're lying, you're lying. Jerry couldn't find that causes compounds near emotional distress, compounding, I should say, severe emotional distress. Just to be very clear, Your Honor, I'm not saying these comments were appropriate. I just want to make that very clear. And I think that's common ground that these were inappropriate comments. I'm asking a specific question about either intent or recklessness to tank the investigation. And at a minimum of not knowing. It does seem like he was out with antagonism to get either her or her mother. And tanking the investigation so that this child knows without having investigated at all. It's one thing if she'd come to a different conclusion. No investigation whatsoever. We're not believing the girl. We're out to destroy this investigation. To think, is that at a minimum reckless? That that would not cause additional trauma? And you cannot trust the adults around you to protect you? You're a child in school. So, Your Honor, one thing, not that I think it's legally relevant, but Principal James is a woman. I'm sorry, did I say he? I thought you did. I did. I think it's because it's James. I apologize. Yes, she. So, I don't, well, for one thing, I don't think the comments themselves, though inappropriate, evince an intent to tank the investigation. I mean, the nature of what she says is she's going to. Okay, the only issue here is whether a jury could find it did and a jury could find that the person in charge of the school say, without even seeing the videotape that it is. That that takes the investigation, because it's telling everybody who's supposed to be in charge of looking into this at the outset. That is. So a jury could find that that is. Outrageous and taking the investigation. I don't think a jury can find that that the principal intended these comments to cause James. I don't think they can find that she was reckless either because again, there was no, there's no basis for principal James to think that that Jane would ever hear that. That's that's my question. Does the perpetrator have to intend for the victim to know that she's doing these outrageous things. There is a case. It's homing versus Goyle. And that's a case in which the defendant gives a stalker information about the plaintiff knowing well that the stalker is going to use that information to harass the plaintiff. So the phone number, the home address of the plaintiff. And it doesn't seem that that case contemplates that the perpetrator had to know that the victim would find out that the perpetrator did it because Jane did overhear this and knows what. Principal James is. Intense were and that's what caused her extreme harm. So it just seems to me the elements are met potentially a jury could find extreme outrageous conduct that this extreme outrageous conduct. Caused harm because Jane found out about it and there's testimony that there's damages. There's a psychiatrist saying this amplified her trauma and the only thing that the district court and apparently you have to. I guess contradict that is that she didn't know that Jane was listening and I don't know that that's enough to evade liability under these circumstances. So I it's not the only thing we have, but we're accepting this your premise that this satisfies the outrageous steps. So I'm putting that to one side. I'm saying outrageousness and causation. The only thing in that standing in the way is is you're saying that she didn't intend for her to hear this. That's where I did intend to hurt her by embarrassing her, but I didn't intend to hurt her by her hearing this. That just seems to be really cutting things very fine. No, I don't. I think it is appropriate to distinguish between an allegation that her that her conduct in in, for instance, the, the assertion that she misdescribed the video to professor to superintendent Pender. That's knowingly is characterized a jury could find. That's right. That's right. Different than misdescribed. You're intentionally mischaracterized. It's very good time. Right? So I do think there's a distinction between between those two things. And for that, the problem there is that there is there's no evidence that that that that caused Jane, the extreme distress that's required. It could be viewed as evidence of principal James's intent. But, you know, she said it was BS. She said I'm gonna embarrass her. And even though Jane didn't know it, there's more evidence of that intent based on other things that she did that Jane didn't even know about. But that doesn't mean it's not it's irrelevant or it's not admissible. But my my question just is, it just seems to me that you're saying, because principal James didn't intend for her to hear this. That's what precludes liability. And I don't know of any case law that says that I don't I confess that I don't know of any case law that directly addresses that point. I just think it. It follows logically, you have to you have to intend the person has to intend that the outrageous conduct will cause the plaintiff extreme emotional distress. There's that this is logically she intends her harm. She says so explicitly. I'm going to embarrass her. She overhears it. And so the harm has been done. And just logically, why should this principle escape liability just because she didn't intend for her to hear that when she was doing extreme outrageous things and she did hear it. Well, I think part of it is because and the case law, I think, bears this out. And I think that the case bears this out. This is a narrowly confined tort. It has to be extreme conduct. That's a very high bar. And we have that. And it has. And I think it has to be extreme conduct that you intend to cause the extreme emotional distress. Yes, you don't imagine. So this is a hypothetical. Imagine you have a principal and a similar sexual assault allegations before the student even comes in. There's zero chance of overhearing reporting or anything. The principal engages in a conspiracy with all the people involved in the school that are going to be in charge of investigating this. And as well, it's a district. The principal says this person, the student, the student's family, they're royal pains, royal irritants. They're nothing but troublemakers. They're always suing everybody. They're always making up claims. We need to teach them a lesson. This is a total BS claim. And we need to make sure this investigation exposes them for the frauds they are. So there's no chance the victim or family members can hear about this. It's a really good conspiracy encoded in everything. Everybody's sworn to secrecy. And it never, in fact, comes out until later in discovery and litigation because it's a conspiracy. But, in fact, the investigation is tanked. The child is told again and again, no one believes you. You're a liar. We think you're a liar. Or that you wanted this, that it was consensual, which causes evidence, you know, provable, the jury could find additional harm. Is it your position? I think you would admit or tell me otherwise that that would be extreme outrageous conduct that causes harm relevant for Title IX. Is that correct? Well, for Title IX or for IAED? I'm sorry, IAED. I apologize. Yes, but I'd like to explain why. I mean, I think the reason why is because there, I think what the extreme, what the true extreme and outrageous conduct intended to cause harm is the conspiracy and the subsequent tanking of the investigation. And those secret comments that we learned about later sounds like smoking gun evidence of intent. But that, but that what actually is the outrageous conduct that intentionally inflicts the harm is the sort of subsequent. But you wouldn't change it just with that. So, if we then change the hypothetical so that the principal without investigating is just convinced this thing is a fraud and we just need to get rid of this and make a clear message that we don't have fraudulent allegations like this in our school. So, it's not intending to harm in that sense, but it's reckless as to the conclusion that this is fraud and needs to be shut down. It would be the same. I mean, again, I think if you're positing that then they actually sort of do inappropriate things to tank the investigation, then. Inappropriate. They just continually say, we don't believe you. We don't believe you. But, yes. I would say that's inappropriate if they're not sort of investigating. Right, right. Yes. Right, right. But I think that, I think the distinction here is that the. So, your answer to Judge Pan's question is, does the victim actually have to hear it face to face and know about it is no. That's not required. It's just a question of degree then on how. Harm to the telling subordinates that don't even bother this investigation. It's bullshit. Does this put a jury find that this. Was sufficiently like that and because of all the ensuing things that happened. I think you would, I think you would need. Outrageous conduct sort of. That causes extreme distress in the, in the. Misconducting or non conducting of the investigation. The distress will come from. The person's that the child's not going to be upset about paperwork, not processing correctly. It's going to be the, the outcome of adults around her disbelieving her. And in my hypothetical blaming her, or that that would be the source of the harm, even if doesn't know where this is coming from. Right? Yes, but again, I think you, you still have to have. Intent to. Yeah, and, and, and, and something about, like, the actual nature of how the investigation was done. That that the secret comments are our evidence was done with the requisite comments and the ensuing response. Would be what would cause the harm to the child. The harm is going to the child's going to perceive the harm as. I'm not protected. They're blaming me. It must have been my fault. People think I'm a liar, but I'm telling the truth. That's the harm that that person's going to feel. Right? Yes, I think I think my basic point is that if you're asserting that's the assertion in this case, but the comments themselves are the. Are the outrageous conduct that causes the harm. Then, if they are, if they're made with no intent that they ever be heard. Then, then that or active upon. We just said they don't have to be. I mean, they have to be heard by. Yeah. No, I mean, I mean, sort of ever heard even through it through a through a chain. So, is it your position then that if something. If the defendant of something extreme and outrageous, which is an intent to harm the plaintiff. And the plaintiff learns of this, and it causes her extreme distress. There's no liability. If the perpetrator didn't intend for her to hear it. If the, if all you're talking about is, is the, if the comments themselves, you're saying that's the injurious that's the. Why am I limited to that? The whole thing is. That she's making comments and calling a sexual assault victims allegations. That she's saying, I'm gonna embarrass her in front of the police that she's potentially tanking the investigation. All of it is extreme and outrageous. And the victim hears this, and it causes her extreme. Damage and, and, and this is the principal of her school who is supposed to be taking care of her. So, she has heard it. And I think I hear your position to be if it wasn't intended that she hear it, there's no liability, even though there was. Intentional or reckless. Intent to cause her harm. And it did cost her. So, I, I don't think the conduct that supposedly actually caused separate from the comments themselves, the conduct that. That the comments refer to, and that, you know, again, calling the police is not itself extreme outrageous conduct. I don't want the police in order to embarrass the victim. A jury could find is extreme and outrageous conduct. I mean, I don't, I don't think so for the whole purpose of embarrassing the sexual assault victim in front of the police. I don't think that's a jury could find that. I know you disagree. A jury could find that that's extreme and outrageous. So, let's just put that aside and not argue about the, what a jury would find. But a jury could find that it was. And I don't know that why we have to identify exactly what was outrageous about this when there's like three or four different possibilities. But the victim heard it. And it did cause her harm. And it was extreme and outrageous. That's what the elements are. And it just sounds to me that the only correct me if I'm wrong. The only thing you say that stands when we have liability. Is that the perpetrator didn't intend for her to hear it. If you've taken away my argument that it's that it's doesn't meet that register. And that's the other argument we've made is that there's a lack of intent here and I. But there is intent to cause for harm. It's just not the particular harm. Like, I intend to embarrass you from the police, but then you overheard me saying it. So, just because all you did was overhear me saying it, that's not what I intended. And I'm free of liability if I'm principle change. I think she cannot be held liable for the comments themselves because she did not intend for them. It's intent or recklessness. I don't know why you. I'm sorry. I just mean that as a short hand. I'm not trying to dispute that. Then let's use the shorthand reckless. Okay. Right outside the door. And even more relevantly, as far as I'm concerned. The people who are right within earshot and to whom these comments are directed are the people that are supposed to protect that. I don't I don't think there's evidence that principle James knew that they were right outside the door and there's certainly no evidence that she had a reason to think that these comments were being. They were right outside the door. And I think a jury could infer that they're not going to go walk a mile away when someone just runs out in distress. And she, I think, I think James said that she could hear not understand the words to be clear, but could hear the voices in there talking. So they weren't that far away. I don't I don't think James knowledge speaks to whether principle was reckless was reckless was reckless. No, I, I'm why is it not reckless to say this. And directly intently intentionally to the people are supposed to cut do the investigating. I mean, I take the point that it's, I think it could be reckless in a sort of everyday sense of that word. But I think for everyday sense. I think to be reckless in this sense, it would need principle James would have to assume that they are then going to tell that it's likely that they're going to turn around and tell Jane these things. And I don't think that makes any sense. And I don't think that that Jane Doe has ever made that. In fact, I don't think there's any argument in her brief that that proffers a distinct theory of how this satisfies a requisite standard. If it does not satisfy the intent standard. Unless the court has any further questions, we'd have to choose. I don't think you ever addressed Poland versus oil and why that doesn't stand for the proposition that the perpetrator just have to know that the victim would know that they did this. I don't think I'm familiar with that case in the briefing. I'm not sure if my locker founded in the briefing, but it's a, it's a defendant giving the stalker information about the plaintiff knowing full well that the stock will use that information to harass the plaintiff. And then the stalker does that. It doesn't seem like that sounds that sounds right to me. And I, I just don't think that's that lines up with the facts here. It just seems that you don't have to intend the victim to know that you're doing it. So, if principal James and I can find principal James's tanking investigation, she finds Jane finds out about that upsets her. I think the distinction is in that case. It sounds like that the defendant intended the harm that that's intended the acts that caused the harm. Yes, and it sounds like from the facts of that case, wanting to say, intending the harm, which is a different thing, intending the acts that caused the harm. But I think the ID tort requires intent as to the result of extreme emotional distress. I think that's that's the case. I don't think James ever disputed that. So that's that. You intend the acts to intend the harm, the acts, knowing that harm will ensue. Or I think this word is both. I think you have to, they have to be intentional acts that you either intend or reckless as to the result that they are going to cause. But that sounds like a scenario where sure that defendant sounds like they intended their acts and and intended them to have the extreme emotional distress. And that's the piece that I think we don't have here. Thank you very much. We'll give you two minutes. With respect to the intentional infliction of emotional distress claim. I believe that there's no question that this claim should have gone to a jury. What's required to prove intentional infliction of emotional distress is extreme or outrageous conduct that intentionally or recklessly causes the plaintiff severe emotional distress. What we posit the court backwards here is that the court analyzed the intent and solely the intent as intentional and did not analyze the comments themselves as for what they were. There is case law in the district. The Bushrod case and the Walden case, which requires that you analyze the outrageousness of the conduct first. And that is because subjective intent can rarely be proven. That's a quote from Walden. And what you're entitled to as a litigant is if you can show that the comments conduct was objectively outrageous. It can be inferred to it can be used to infer the existence of intent on the part of the speaker actor. I think the problem is, I think it's clear or jury could find that it's clear that there was extreme outrageous conduct that was intended to harm Jane. But the actual harm to her was different from what was intended. Because if the intent was to take the investigation, but the harm was that she overheard it, that's what upset her. There's a disconnect within the theory. And that's what I'm struggling with. Sure. So I think the harm is not just that she overheard it, but the harm is that she's a victim of a sexual assault that's going to her principal, who's the person who's tasked to investigate this. It has to be reported to make the report that this occurred. She's putting her fate in these administrators hands. And instead of objectively doing this, they obviously, James makes these comments. She does eventually hear these comments and it does have a negative impact on her. No, there's no doubt. I think that that part of it's proved or a jury could still find that the issue is proving the intentional infliction of the actual harm, because intent implies that the perpetrator intended the harm. And what Principal James was saying in the meeting tended to, it was disrespectful, etc. But her intent seemed to be to embarrass Jane and tank the investigation. But she didn't intend to harm Jane by Jane hearing her saying these things and then amplifying her trauma. So it just seems like there was extreme outrageous conduct. It did cause harm, but the intent of extreme outrageous conduct was to tank the investigation and embarrass her in a different way than what actually happened, which was she overheard what was said. And that's what really upset her. And I haven't been able to find any case law that kind of addresses this. There's an intent to harm, but the actual harm is different from what was intended. I believe that the existing case law, so the cases I just cited, Bushrod and Walden, that establish the intentional or reckless standard. I think that's where there's the sort of key here. These comments, if we're just talking about the comments, and I think we do have to talk also about the comments. Is it reckless that she would overhear it, or is it just reckless that it would tank? Well, I think it's reckless in what sense for our purposes. I actually think it's all of it, Your Honor. So I think it's reckless in the context in which they were made, the fact that it would be easy for her to overhear it, but also in the context in which she's bringing this allegation to them and conducting the investigation. I mean, the harm that occurred as a result of James's conduct is not just the fact that she overheard these comments. It's also the fact that James deliberately misconstrued what was on the video to Dr. Pinder. That caused a delay in the transfer. I think there's another element. Well, she did know about the delay. She certainly felt the delay, Your Honor. So I think that that's established as part of the record. I'm just trying to think about general tort law principles. You have cautious action and intent or recklessness with the requisite mens rea with the cautious action. If the harm that you occasion is not one you attended but was reasonably foreseeable, the tort pleas are still responsible for it? I believe so under a recklessness standard, Your Honor. I think if it was just intentional, it would not be, but under recklessness, I think it would be. How many other people were in the room? There are two other people in the room and one on a phone. One on a phone. So three other people. I assume none of them were sworn to secrecy. There's no evidence that James said. Certainly not under oath. I'm just making first-year torts here trying to think about it. I'm going to pull out a gun because my intent is to scare somebody and to cause them emotional trauma because I'm mad at them for whatever reason. And instead the consequence is it's been snowing or icy or something and they try to run away from me and slip and fall on the ice and break their leg. I assume I'm responsible for that broken leg even though I only intended emotional trauma? I believe under that scenario it would be. It would be. If you knew of the circumstances. It's a different harm than what you intended. You intended some kind of harm. It's a different one that results, but it's not... Unforeseeable. It's reasonably foreseeable that these words would come to her ears. I believe that's correct, Your Honor. I have, if I may, Your Honor, I have just another point about Debser, which was discussed at length. That case, and counsel touched on this, but in that case that was a teacher who was sexually harassing a student and they found under principles of agency that that teacher's conduct could not be extrapolated to the administrators. I think what we have here is a different situation. This is not a school administrator sexually assaulting a student as was the case there. This is a school administrator acting with deliberate indifference through her various comments and actions after the sexual assault was reported to her. I believe that under Debser, that's a completely different analysis. And I think that this actually falls squarely within Debser in terms of the school having actual knowledge of a report of the sexual assault and then taking contrary and discriminatory actions after that. So I believe Gaines's conduct can be extrapolated to the school under Debser. With respect to retaliation, there's a case that we're relying on Doe versus Manor College where a student was retaliated against after reporting sexual harassment. And the retaliation included sanctioning her. And I think that is something that is akin to what occurred in this case with the marking of the absences and putting her. Is there any evidence at all or a majority of the marked absences should have been excused? There's no evidence that the majority should have been excused, your honor. That there's evidence that I think I think it's something like 19 should have been excused. Ten were ultimately excused. And again, our claim is that her condition by the time that this was overturned, of course, had snowballed in terms of what was going on with her mentally, physically, in terms of her mental health and being able to participate fully in school. Thank you very much. Thank you very much. Thank you.
judges: Millett; Katsas; Pan